1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                         CENTRAL DISTRICT OF CALIFORNIA

10

11   LAVONDA M. HARRIS,                )   No. EDCV 05-00474-SS
                                       )
12                  Plaintiff,         )
                                       )   **MEMORANDUM DECISION AND ORDER**
13              v.                     )
                                       )
14   JO ANNE B. BARNHART,              )
     Commissioner of the Social        )
15   Security Administration,          )
                                       )
16                  Defendant.         )
                                       )
17   ─────────────────────────────────)

18       Lavonda M. Harris ("Plaintiff") brings this action seeking to

19   overturn the decision of the Commissioner of the Social Security

20   Administration (hereinafter "Defendant," "Commissioner," or the

21   "Agency") denying her application for Supplemental Security Income

22   Benefits.  Alternatively, she asks for a remand.  The parties consented,

23   pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned

24   United States Magistrate Judge.  Pursuant to the Court's Case Management

25   Order, the parties filed a  joint stipulation ("Jt. Stip.") on February

26   13, 2006.   For the reasons stated below, the decision of the

27   Commissioner is AFFIRMED.

28   \\

1

2

**PROCEDURAL HISTORY**

3

4      Plaintiff was born on July 31, 1954 and was forty-nine years old at
the time of the March 9, 2004 hearing.  (Administrative Record ("AR")
540, 709).  She completed high school and has past relevant work
experience as a cashier and a cook.  (AR 561).

7

8      On March 2, 1998, Plaintiff filed an application for Supplemental
Security Income ("SSI") benefits.  (AR 63-65).  She claimed that she
became unable to work on July 16, 1997, due to back and leg pain,
migraine headaches, and depression.  (AR 63, 66).  After the Agency
denied her claim initially and upon reconsideration, a hearing was held
before Administrative Law Judge ("ALJ") Alan R. Demby on February 1,
1999.  (AR 43, 47, 49, 58).  On March 18, 1999, ALJ Demby issued a
decision denying Plaintiff benefits.  (AR 29-37).  Plaintiff sought
review of ALJ Demby's decision before the Appeals Council, which upheld
the ALJ's decision on April 28, 2000.  (AR 25).  Plaintiff did not
appeal this claim in federal court.  (See Jt. Stip. at 2).

19

20      On February 27, 2001, Plaintiff filed another claim for SSI
benefits.[1]  (AR 227-29).  She again claimed that she became unable to
work on July 16, 1997, due to lower back pain, migraine headaches, leg
cramps, and depression.  (AR 227, 238).  After the Agency denied her
claim initially and upon reconsideration, a hearing was held before ALJ

25

26      _____

27      [1]  Plaintiff appears to have filed an additional SSI application on
July 6, 2000.  (AR 224-26).  However, there is nothing in the record or
the Joint Stipulation to indicate what, if anything, resulted from this
28      application.

2

Mason D. Harrell on August 8, 2002.  (AR 20-24).  On August 22, 2002,
ALJ Harrell issued a decision denying benefits.  (AR 12-19).  Plaintiff
sought review of ALJ Harrell's decision before the Appeals Council,
which upheld the ALJ's decision on February 16, 2003.  (AR 5).
Plaintiff filed an action in this court on April 9, 2003, EDCV 03-00364-
SS, and the Court affirmed the Commissioner's decision on January 23,
2004.  (See Jt. Stip. at 2).

Plaintiff filed the SSI application currently at issue on November
18, 2002.  (AR 540).  She claimed that she became unable to work on
January 1, 1997 due to blackouts, migraine headaches, lower back pain,
muscle spasm, and depression.[2]  (AR 552).  A hearing was held before ALJ
Mason D. Harrell on March 9, 2004.  (AR 709).  Plaintiff, who was
represented by counsel, testified on her own behalf.  (AR 713-17).  Dr.
Craig Rath, a medical expert, and Sandra Fioretti, a vocational expert,
also testified.  (AR 717-32).  On April 29, 2004, ALJ Harrell issued a
decision denying benefits.  (AR 483-93).  Plaintiff sought review of the
ALJ's decision before the Appeals Council.  (AR 481).  On April 28,

---

[2]  It should be noted that when a claimant reapplies for benefits,
prior findings of nondisability create a presumption of continuing
nondisability.  Plaintiff may overcome this presumption, however, by
showing that circumstances have changed since her last denial,
subsequently increasing the severity of her impairment.  Chavez v.
Bowen, 844 F.2d 691, 693 (9th Cir. 1988) (citing Taylor v. Heckler, 765
F.2d 872, 875 (9th Cir. 1985)); see also Lester v. Chater, 81 F.3d 821,
827 (9th Cir. 1995).  As noted above, Plaintiff previously filed
applications for supplemental security income on March 2, 1998 and
February 27, 2001, both of which alleged that Plaintiff became unable to
work on July 16, 1997 due to back and leg pain, migraine headaches, and
depression.  (AR 63-66, 227-229, 238).  The ALJs denied benefits in both
cases, the Appeals Court upheld these decisions, and this Court affirmed
the denial of the second application.  (AR 5, 12-19, 25, 29-37).
Plaintiff is alleging that her symptoms worsened since her last denial.

2005, the Appeals Council denied Plaintiff's request for review and the ALJ's decision became the final decision of the Commissioner. (AR 478-80). Plaintiff commenced the instant action on June 9, 2005.

## FACTUAL BACKGROUND

### A.  **Plaintiff's Medical History**

On July 11, 1997, Plaintiff was rear-ended in a car accident. (AR 90). On July 22, 1997, Plaintiff sought treatment at the Community Hospital of San Bernardino, where she was diagnosed with "contussion [sic] syndrome." (AR 139). On July 29, 1997, Plaintiff sought treatment from Dr. Barbara Stanfield, a chiropractic doctor with the Lalama Chiropractic Offices. (AR 133). Plaintiff complained of headaches, blurred vision, ringing in her ears, and low back pain, which radiated to her thighs. (AR 133-34). Dr. Stanfield continued to treat Plaintiff through December 19, 1997. (AR 133). On January 21, 1998, Dr. Stanfield referred Plaintiff to Dr. Ralph Steiger, an orthopedic doctor, for an orthopedic consultation. (AR 133).

Plaintiff was evaluated on June 4, 1998 by Dr. Jonathan Greer, a doctor with the McKee Family Health Center. (AR 150-51). Plaintiff complained of low back pain, throbbing headaches, and ringing in her ears. (AR 150). Dr. Greer noted his impressions indicating that Plaintiff had "[l]ow back pain with symptom magnification," headaches most likely caused by muscle tension, and intermittent ringing in her ears. (AR 150). Plaintiff was prescribed pain medications. (AR 151). Plaintiff saw Dr. Greer in June, September, and October of 1998 with

4

complaints of low back pain.   (AR 147-49, 161, 163).   Dr. Greer
continued Plaintiff on the same medications, and instructed Plaintiff on
stretching and back exercises.   (AR 161).   Dr. Rosemarie Colombini, a
doctor of osteopathy, stated in her notes from a September 8, 1999
examination that Plaintiff had undergone physical therapy but did not
routinely do her low back exercises.   (AR 406).   Plaintiff began seeing
Dr. Deborah Small at the McKee Family Health Center on July 13, 2000.
(AR 393).   On August 17, 2000, Plaintiff told Dr. Small that Ultram, a
pain medication, "significantly reduces her pain" although it did not
completely go away, and she was "doing pretty well on it."   (AR 391).
Dr. Small noted on May 11, 2001 that there was no change in Plaintiff's
chronic low back pain.   (AR 386).

On, June 28, 2001 Plaintiff was seen at the Arrowhead Regional
Medical Center where she reported that she had no pain that day.   (AR
601).   In October and December, 2001 and May, 2002, Plaintiff was seen
at the medical center for other complaints, but also noted low back
pain.   (AR 425, 427-28).   On December 12, 2002, Plaintiff was seen for
complaints of low back pain.   She was prescribed Motrin and was referred
to physical therapy in the event she did not improve.   (AR 599).
Finally, Plaintiff was seen at Arrowhead Regional Medical Center on
April 18, 2003 complaining primarily of a cough, but also noting low
back pain.   (AR 690).   Plaintiff told the doctor that she was given a
prescription for narcotics and Motrin at her last appointment in
December, but that she never picked them up.   (AR 690).   The doctor
again told Plaintiff to return if her back pain did not improve after
\\
\\

three to four weeks. (AR 690). The record does not contain any physical examination reports after April 18, 2003.[3]

Plaintiff received psychiatric treatment through Phoenix Outpatient Services beginning December 10, 1998. (AR 187). Dr. Gill was Plaintiff's primary treating psychiatrist through March 20, 2003, at which time Dr. Kari Enge took over this role. (AR 629-30). On one occasion, Plaintiff saw Elaine Holzer, a Marriage, Family, and Child Counselor, who evaluated Plaintiff on December 29, 1998. (AR 667-70). On the evaluation form, Ms. Holzer indicated that Plaintiff "reports depressed mood, frequent tearfulness, decreased sleep, hopelessness, helplessness, anhedonia, decreased appetite, increased irritability, and thoughts of 'not wanting to be here' though she denies suicidal intent." (AR 667). She also noted that Plaintiff made vague references to auditory hallucinations and had difficulty remembering past dates and current appointments, although she had no other mental status problems. (AR 669).

From March 2001 until late October 2001, Plaintiff often missed her appointments and did not take her medications for days at a time.[4] (AR 442-48, 657, 660). Plaintiff reported on October 23, 2001 that

---

[3]  During the March 9, 2004 hearing before ALJ Harrell, Plaintiff reported a new condition -- left hand numbness. (AR 715). She reported that she was seeing a specialist for treatment and the ALJ requested copies of these records. (AR 731-32). The records were never received. (AR 490-41).

[4]  Plaintiff missed appointments on May 14 and 15, 2001, July 17, 2001, and August 14, 2001. (AR 446-47, 657, 660). She reported not taking her medications on May 15, 2001, July 17, 2001, September 4, 2001, and October 2, 2001. (AR 444-47).

"sometimes T.V. gives me messages . . . telling me that I am worthless." (AR 443-48, 657, 660). Dr. Gill noted that Plaintiff decompensated without her medications and that her compliance had ranged from fair to poor. (AR 443-48, 657, 660). On November 6, 2001, Plaintiff reported that "I feel [a] little better" and Doctor Gill indicated her compliance was good. (AR 442). Plaintiff rescheduled her November 20, 2001 appointment and she reported on November 27, 2001 that she had been without medication for a few days. (AR 440-41). Dr. Gill again noted that Plaintiff's compliance was poor and that she "decompensates" without medication. (AR 440). On December 18, 2001, Plaintiff reported that she was "doing [a] little better" and Dr. Gill indicated her compliance was fair. (AR 439). Plaintiff was not seen again until February 26, 2002. (AR 436-38). At this appointment, Plaintiff reported that she was "feeling better" and Dr. Gill noted her compliance was fair. (AR 436).

Plaintiff canceled her March 2002 appointment and next saw Dr. Gill on April 2, 2002. (AR 434-35). From April through June 2002, Dr. Gill reported that Plaintiff's compliance was good. (AR 430-434, 641). On April 23, 2002, Plaintiff denied any major problems, and during May and June Plaintiff only reported that she was anxious about a lump doctors found in her breast. (AR 430, 433, 641). On July 2, 2002, Plaintiff reported that she stopped taking her medication because of itching. (AR 640). Reports indicate that from July 16, 2002 through October 31, 2002, Plaintiff's compliance was good and again she denied having any major problems. (AR 636-39). Plaintiff was not seen in November 2002, and she canceled her December 10, 2002 appointment at which time she also denied having any major problems. (AR 635). However, on December

12, 2002, Plaintiff reported that she had been without medication for a few days, and on January 9, 2003 Plaintiff did not show up for her appointment, but again told Dr. Gill that she was out of medication. (AR 633-34). At her next appointment, on February 13, 2003, Plaintiff reported that she was hearing voices and that her roommate was giving Plaintiff her medication. (AR 632). Plaintiff did not show up for her next two appointments. (AR 630-31).

Beginning March 20, 2003, Plaintiff was seen by Dr. Enge at Phoenix Outpatient Services. At her March and April 2003 appointments, Dr. Enge noted that Plaintiff's compliance was fair and "ok." (AR 628-29). Plaintiff rescheduled her May 6, 2003 appointment, and indicated at her May 7, 2003 appointment that she had run out of medication two days before. (AR 688-89). At her May 20, 2003 appointment, Dr. Enge noted that Plaintiff was compliant. (AR 687). Plaintiff did not show up for any of her three scheduled appointments in June 2003, and was next seen on July 8, 2003. (AR 683-686). At this appointment Plaintiff reported that she ran out of medication and that she was "not doing too well." (AR 683).

On August 4, 2003, Dr. Enge filled out a mental work capacity evaluation regarding Plaintiff.[5] (AR 707-08). Dr. Enge found Plaintiff was moderately limited in her ability to ask simple questions or request assistance, to maintain socially appropriate behavior and basic

_____

[5] The form asks the evaluator to determine Plaintiff's limitations in several areas and identify whether there is no limitation, whether the limitation is unknown, or whether the limitation is "Slight," "Moderate," "Marked," or "Extreme." (AR 707).

standards of neatness and cleanliness, and to be aware of normal hazards and take appropriate precautions. (AR 707-08). She found Plaintiff to be markedly limited in her ability to understand, remember, and carry out very short and simple instructions, maintain exertion and concentration for extended periods, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, interact appropriately with the general public, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. (AR 707-08). Dr. Enge checked the extreme limitation box for Plaintiff's ability to remember locations and work-like procedures, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, make simple work-related decisions, and accept instructions and respond appropriately to criticism from supervisors. (AR 707-08). Finally, Dr. Enge concluded that on average Plaintiff would likely have to miss work three or more days per month due to her impairments. (AR 708).

Plaintiff was next seen by Dr. Enge on August 26, 2003, at which time Dr. Enge reported that Plaintiff's compliance was "ok," however, Plaintiff reported having hallucinations and being afraid to leave the house. (AR 703). Plaintiff showed no significant improvement on September 22, 2003. (AR 702). She cancelled her October 2003 appointment and was next seen on November 13, 2003 at which time Plaintiff complained of tactile hallucinations. (AR 699, 701). Again, Dr. Enge noted that Plaintiff's compliance was only "ok." (AR 699). On November 17, 2003, Dr. Enge filled out a Client Recovery Plan on which she noted Plaintiff "will maintain current stability with psychotropic

medications and case management." (AR 700). Plaintiff did not show up for her December 12 and 22, 2003 appointments, and was next seen by Dr. Enge on January 15, 2004. (AR 696-98). At her January appointment, Plaintiff reported being out of medication for "a while," and that voices were screaming at her to hurt herself and her roommate, but that she was okay if she did not leave her room. (AR 696). Dr. Enge reported that Plaintiff's compliance was poor and summarily stated that Plaintiff "Needs SSI." (AR 696). The record does not contain any psychiatric treatment notes subsequent to January 15, 2004.

### B.   Consultative Examinations

Plaintiff underwent multiple consultative examinations. On September 24, 1998, Plaintiff's mental residual functional capacity ("RFC") was assessed.[6] The doctor determined that Plaintiff was not significantly limited in any category.[7] (AR 174-75). Rather, the report concluded that Plaintiff was "limited by low back pain only, no mental limitations noted." (AR 176).

\\

\\

---

[6] Residual functional capacity is "what [one] can still do despite [her] limitations" and represents an "assessment based upon all of the relevant evidence." 20 C.F.R. §§ 404.1545(a), 416.945(a). Based on the signature, it appears that Dr. Greer conducted Plaintiff's assessment on this date. (AR 176).

[7] The RFC form requires that the evaluator determine whether Plaintiff was "Not Significantly Limited," "Moderately Limited," "Markedly Limited," "No Evidence of Limitation in this Category," or "Not Ratable on Available Evidence" on various abilities under the categories of "Understanding and Memory," "Sustained Concentration and Persistence," "Social Interaction," and "Adaptation." (AR 174-75).

10

On April 2, 2001, Dr. Linda Smith, a Board Eligible Psychiatrist with the Alto Medical Clinic, conducted a complete psychiatric evaluation of Plaintiff. (AR 312-17). Dr. Smith found Plaintiff was "not very credible as a historian...[she] was fairly melodramatic but she could not give very many convincing details of her symptoms." (AR 312). Plaintiff complained that she was "[e]xtremely depressed." (AR 312). Plaintiff admitted to Dr. Smith that she was not seeing a psychiatrist at the time of the interview. (AR 313). In addition, Dr. Smith described Plaintiff as "very inconsistent" and "quite evasive" regarding her medication. She stated her belief that Plaintiff "probably has not been getting any medication for an unknown period of time." (AR 313). She went on to note that "[d]uring the formal mental status exam [Plaintiff] was not at all credible and gave significant evidence of attempting to feign a poor mental status. There was evidence of exaggeration, manipulation, and possible malingering." (AR 315).

On April 26, 2001, Dr. K. Gregg conducted a mental RFC assessment of Plaintiff. (AR 321-28). He concluded that Plaintiff was not significantly limited in all areas except that she was moderately limited in her ability to understand, remember, and carry out detailed instructions.[8] (AR 321-22). In assessing Plaintiff's degree of limitation, Dr. Gregg concluded that Plaintiff was mildly limited in her

---

[8] The RFC form required that the evaluator determine whether Plaintiff was "Not Significantly Limited," "Moderately Limited," "Markedly Limited," "No Evidence of Limitation in this Category," or "Not Ratable on Available Evidence" on various abilities under the categories of "Understanding and Memory," "Sustained Concentration and Persistence," "Social Interaction," and "Adaptation." (AR 321-22).

activities of daily living and in her ability to maintain social functioning.[9]  In addition, he found she was moderately limited in her ability to maintain concentration, persistence, or pace.  Finally, he indicated that Plaintiff has not experienced any episodes of decompensation.  (AR 326).

On May 30, 2001, Dr. Alexander Michelson, a doctor of internal medicine with the Alto Medical Clinic, conducted a complete internal medicine evaluation of Plaintiff.  (AR 329-33).  Dr. Michelson concluded that Plaintiff suffered from a low back condition, most likely caused by low back sprain or strain.  (AR 333).  As a result, he found she was restricted in pushing, pulling, lifting and carrying to about fifty pounds occasionally, and about twenty-five pounds frequently.  He found Plaintiff was unrestricted in her ability to sit, stand and walk, however, she could only occasionally bend, kneel, stoop, crouch, crawl, walk on uneven surfaces, and climb a ladder or stairs.  (AR 333).

On May 31, 2001, Dr. Leonard H. Naiman conducted a physical RFC assessment of Plaintiff.  (AR 336-45).  Dr. Naiman determined that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently, could sit and stand and/or walk six hours in an eight-hour work day, and was limited in her ability to push and/or pull using her lower extremities but not her upper extremities.  (AR 338). \\

---

[9]  The RFC form required that the evaluator determine whether Plaintiff's degree of limitation is "None," "Mild," "Moderate," "Marked," "Extreme," or that there is "Insufficient Evidence."  (AR 326).

He found that she could only occasionally climb, balance, stoop, kneel, crouch, or crawl.  (AR 339).

On December 31, 2002, Dr. M. Becraft assessed Plaintiff's mental RFC.   (AR  606-22).   Dr.  Becraft  found  that  Plaintiff  was  not significantly limited in her ability to understand and remember, except that she was moderately limited in her ability to understand and remember detailed instructions.[10]  (AR 620).  She also determined that Plaintiff was not significantly limited in her ability to sustain concentration and persistence, except that she was moderately limited in her ability to carry out detailed instructions, and she ranged from not significantly limited to moderately limited in her ability to complete a normal workday and workweek without interruptions.  (AR 620).  In addition, Dr. Becraft found that Plaintiff was not significantly limited in her ability to socially interact, except that she ranged from not significantly limited to moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (AR 621).  Finally, Dr. Becraft concluded that Plaintiff was not significantly limited in her ability to adapt.  (AR 621).

On April 15, 2003, Dr. Cooley conducted a physical RFC assessment of Plaintiff.  (AR 672-79).  Dr. Cooley determined that Plaintiff could

---

[10]   The RFC form required that the evaluator determine whether Plaintiff was "Not Significantly Limited," "Moderately Limited," "Markedly Limited," "No Evidence of Limitation in this Category," or "Not Ratable on Available Evidence."

lift and/or carry twenty pounds occasionally and ten pounds frequently, was otherwise unlimited in her ability to push and/or pull, and could stand and/or walk, as well as sit for a total of about six hours in an eight-hour workday.  (AR 673).  Dr. Cooley also found that due to reduced range of motion, Plaintiff was capable of climbing, balancing, stooping, kneeling, crouching, and crawling for less than two-thirds of the time.  (AR 674).  Finally, he determined that Plaintiff does not suffer from any manipulative, visual, communicative, or environmental limitations.  (AR 675-76).

In addition, Dr. Cooley evaluated Plaintiff's capacity since the last ALJ decision on August 22, 2002.  (AR 679).  Dr. Cooley found, based on Plaintiff's records, that physically there was "no apparent change from prior ALJ [decision]" and that Plaintiff's mental symptoms were "of minimal severity" when she took her medication.  (AR 679).

## C.   **Plaintiff's Testimony**

On March 9, 2004, a hearing before ALJ Mason D. Harrell was held. (AR 709).  At the hearing, Plaintiff testified that she was uncomfortable and hearing voices.  (AR 713-14).  She also stated that she has not worked since she was in a car accident because she is in constant pain.  (AR 714-15).  When questioned by the medical expert about doctors notes that she sometimes does not take her medication, Plaintiff responded that she does take it.  (AR 717).  Plaintiff also testified that somebody else fills her prescriptions, although she does not know who.  (AR 716-17).

\\

**D.   <u>Medical Expert's Testimony</u>**

Dr. Craig Rath, a medical expert, also testified at the March 9, 2004 hearing.   Dr. Rath testified that the discrepancy between the record and Dr. Enge's work capacity evaluation is likely attributable to Plaintiff being only "partially medicated." (AR 720). He found that it is not until after Plaintiff has been out of medication that she returns for treatment, and that Plaintiff is worse when unmedicated. (AR 720). Dr. Rath further testified that Plaintiff is moderately limited when she takes her medication, while she is markedly limited when she does not take her medication. (AR 720).   He concluded that while medicated Plaintiff is capable of carrying out simple, but not complex, instructions. (AR 724). In addition, she cannot have contact with the general public and cannot work in hazardous situations. (AR 724). However, she can interact with co-workers and supervisors, as long as such contact is not more than moderately stressful. (AR 724). Finally, Dr. Rath testified that while medicated Plaintiff is able to maintain attendance sufficient for regular employment. (AR 724).

**E.   <u>Vocational Expert's Testimony</u>**

Finally, Ms. Sandra Fioretti testified at the March 9, 2004 hearing as a vocational expert.  The ALJ proposed a hypothetical to Ms. Fioretti involving a claimant who is moderately limited in all of the areas listed on Dr. Enge's work capacity evaluation. (AR 725, 728).   Ms. Fioretti testified that such a claimant could find a job as a Small Products Assembler II, a Bench Assembler, and a Cleaner/Housekeeper. (AR 728-29).   The ALJ proposed an additional hypothetical involving a

claimant who is also moderately limited, but who could handle simple, but not complex, instructions, no contact with the general public, no more than moderately stressful interactions with co-workers and supervisors, no hazardous work situations, and would not miss work more than twice per month.   (AR 725).   Again, Ms. Fioretti testified that such a claimant could find a job as a Small Products Assembler II, a Bench Assembler, and a Cleaner/Housekeeper, however, the number of jobs available regionally and nationally was much higher under this second hypothetical. (AR 728-29).

**THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS**

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[11] and that is expected to result in death or to last for a continuous period of at least twelve months.  Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).   The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.   Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920.   The steps are:

---

[11]   Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  20 C.F.R. §§ 404.1510, 416.910.

(1)   Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

(2)   Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3)   Does the claimant's impairment meet or equal one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4)   Is the claimant capable of performing her past work?  If so, the claimant is found not disabled.  If not, proceed to step five.

(5)   Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing Tackett); 20 C.F.R. §§ 404.1520(b) – 404.1520(f)(1) & 416.920(b) – 416.920(f)(1).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five.  Bustamante, 262 F.3d at 953-54 (citing Tackett).  Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry.  Id. at 954.  If, at step four, the claimant meets her burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work

17

that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity,[12] age, education, and work experience. <u>Tackett</u>, 180 F.3d at 1098, 1100; <u>Reddick</u>, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1). The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids"). <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1162 (9th Cir. 2001) (citing <u>Tackett</u>). When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert. <u>Moore v. Apfel</u>, 216 F.3d 864, 869 (9th Cir. 2000) (citing <u>Burkhart v. Bowen</u>, 856 F.2d 1335, 1340 (9th Cir. 1988)).

## THE ALJ'S DECISION

In his April 29, 2004 decision, ALJ Harrell concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (AR 492-93). At the first step, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability.[13] (AR 487). At the second and third steps, the ALJ

---

[12]   Residual functional capacity is "what [one] can still do despite [his] limitations" and represents an "assessment based upon all of the relevant evidence." 20 C.F.R. §§ 404.1545(a), 416.945(a).

[13]   Plaintiff claimed an onset date of January 1, 1997 in her application for SSI benefits. (AR 552). However, at the March 9, 2004 hearing, the ALJ and Plaintiff's attorney agreed to an onset date of November 18, 2002. (AR 712). The ALJ makes no mention of the onset date in his decision. (AR 483-93).

18

determined that Plaintiff suffered from a depressive disorder, which was severe but did not meet or equal any of the listed impairments. (AR 487-88).

Next, at step four, the ALJ assessed Plaintiff's RFC. (AR 488). He found that Plaintiff was limited to a full range of light work activities. Specifically, he determined that Plaintiff was limited to lifting twenty pounds occasionally and ten pounds frequently, and standing and/or walking, as well as sitting, for six hours out of an eight hour day. (AR 488). Mentally, Plaintiff was limited to simple repetitive tasks, could not have contact with the general public, was limited to moderately stressful interactions with coworkers and supervisors, and could not work in hazardous work situations. In addition, she would need to take normal breaks, plus be allowed to miss work two times per month and be late two to three times per month. (AR 488).

The ALJ specifically found that a more restrictive RFC was not appropriate in this case. (AR 488). Regarding the physical RFC, he cited the fact that Plaintiff's physical examination in December 2002 was essentially normal, that Plaintiff did not pick up her pain medication prescribed at that appointment, and that even though she was advised to return if her back pain continued, Plaintiff did not seek treatment again until April 2003 when she sought treatment for a cough. Plus, the ALJ found no subsequent medical treatment notes for back pain. (AR 488). Mentally, the ALJ noted Plaintiff's history of depressive disorder. (AR 488). He outlined Plaintiff's treating history, noting \\

that she missed several appointments and she seemed to deteriorate primarily when she stopped taking her medication. (AR 488-89).

The ALJ rejected Dr. Enge's mental capacity evaluation from August 4, 2003. (AR 489). He found that the evaluation was inconsistent with the medical record as a whole as well as Dr. Enge's own treatment notes, which indicated that Plaintiff's mental condition improved when she took her medication, and, alternatively, decompensated when she was not compliant. (AR 489). The ALJ also cited the testimony of Dr. Rath, the medical expert. (AR 490). Dr. Rath testified that while Plaintiff had marked functional limitations when she was not taking her medications, when she was compliant she was capable of simple, non-public tasks with moderately stressful interactions with coworkers and supervisors. Also, when medicated Plaintiff would only need normal breaks, would not need to miss work more than twice per month, and would only sometimes be tardy. (AR 490). The ALJ found Dr. Rath's opinion to be "well reasoned and consistent with the objective medical record" and, therefore, gave it great weight. (AR 490).

In addition, the ALJ found Plaintiff's daily activities and treatment history "inconsistent with the presence of an incapacitating or debilitating medical condition." (AR 491). Among other things, the ALJ cited Plaintiff's failure to seek treatment or fill pain medication prescriptions despite her current claims of debilitating pain, as well as her failure to show up for appointments despite hallucinations. (AR 491). He also noted that Plaintiff admitted to being able to do some household chores, and to spending her day playing cards, watching television, going to movies, and reading. (AR 491). However, based on

the testimony of the vocational expert, Sandra Fioretti, the ALJ found that Plaintiff was not able to return to her past relevant work. (AR 491).

Finally, at the fifth step, the ALJ found that based on the Plaintiff's RFC and the vocational expert's testimony, that Plaintiff was capable of performing work as a small products assembler, a bench assembler, and a housekeeper. (AR 491-92). Accordingly, he found that Plaintiff was not disabled, as defined in the Social Security Act, at any time through the date of the decision. (AR 492-93).

**STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

"Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)). It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." Id. (citing Jamerson, 112 F.3d at 1066; Smolen, 80 F.3d at 1279). To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that

21

supports and evidence that detracts from the [Commissioner's]
conclusion.'" Aukland, 257 F.3d at 1035 (citing Penny v. Sullivan, 2
F.3d 953, 956 (9th Cir. 1993)).  If the evidence can reasonably support
either affirming or reversing that conclusion, the court may not
substitute its judgment for that of the Commissioner.  Reddick, 157 F.3d
at 720-21 (citing Flaten v. Sec'y, 44 F.3d 1453, 1457 (9th Cir. 1995)).

**DISCUSSION**

**A.   The ALJ Gave Specific And Legitimate Reasons For Rejecting The
Treating Psychiatrist's Opinion**

Plaintiff contends that the ALJ improperly disregarded the opinion
of her treating psychiatrist, Dr. Enge.  Specifically, she asserts that
the ALJ failed to consider Dr. Enge's work capacity evaluation in which
she indicates that "Plaintiff had an 'Extreme' limitation in the areas
of: 1. The ability to remember locations and work like procedures; 2.
The ability to perform activities within a schedule, maintain regular
attendance, and be punctual within customary tolerances; 3. The ability
to make simple work related decisions; 4. The ability to accept
instructions and respond appropriately to criticism from supervisors."
(Jt. Stip. at 4).  Plaintiff also states that according to the same
evaluation, Dr. Enge concluded that Plaintiff suffered nine marked
functional limitations, and would likely miss three or more days of work
each month due to either her impairment or her treatment. (Jt. Stip. at
4).  Plaintiff argues that the ALJ failed to provide a specific and
legitimate rationale for rejecting this opinion, and that he
impermissibly selected evidence to support his own conclusions.  (Jt.

22

1   Stip. at 4-8).   In addition, Plaintiff asserts that the ALJ erred by

2   failing to address Dr. Enge's conclusion that Plaintiff "Needs SSI."

3   (Jt. Stip. at 6).

4

5       Generally speaking, the court must attribute greater weight to the

6   opinions of treating physicians because they are hired to treat the

7   patient and consequently have more interaction with the individual.

8   Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (citing Spraque

9   v. Bowen, 812 F.2d 1226, 1230 (9th Cir. 1987)).   However, while a

10  treating physician's opinion may be entitled to more deference, it is

11  not entirely conclusive as to the question of disability.   Magallanes,

12  881 F.2d at 751 (citing Rodriquez v. Bowen, 876 F.2d 759, 761-62 (9th

13  Cir. 1989)).   The ALJ may choose to disregard or give less weight to a

14  treating physician's opinion, so long as he "make[s] findings setting

15  forth specific, legitimate reasons for doing so that are based on

16  substantial evidence in the record."   Magallanes, 881 F.2d at 751

17  (quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983)).

18

19      In his opinion, ALJ Harrell stated that he considered and rejected

20  the mental capacity evaluation completed by Dr. Enge on August 4, 2003

21  and gave two reasons for this decision.   (AR 489-90).   First, he found

22  that Dr. Enge's evaluation was not consistent with Plaintiff's treatment

23  notes, including those written by Dr. Enge herself.   (AR 489).   Second,

24  he cited the testimony of the medical expert, Dr. Rath, who indicated

25  that Dr. Enge was likely seeing Plaintiff while she was only partially

26  medicated, which would account for Dr. Enge's singular finding that

27  Plaintiff's limitations were marked and extreme.   (AR 490).   As these

28  reasons are specific, legitimate, and supported by substantial evidence

23

in the record, the Court finds ALJ Harrell properly rejected Dr. Enge's opinion as stated in the August 4, 2003 work capacity evaluation.

Dr. Enge's evaluation is inconsistent with Plaintiff's treatment notes, including those completed by Dr. Enge himself.  In March and April 2003, when Plaintiff first began seeing Dr. Enge, Plaintiff's treatment notes indicate that her compliance was fair.  (AR 628-29).  However, in May 2003 Plaintiff ran out of medication and in June 2003 she did not show up for any of her three appointments.  (AR 683-86).  Plaintiff reported in July 2003 that she was "not doing too well," however, she also told Dr. Enge that she had run out of medication.  (AR 683).  Dr. Enge filled out the work capacity evaluation on August 4, 2003.  At her appointment later that month, Plaintiff reported having hallucinations, and Dr. Enge reported her compliance as being only "ok."  (AR 703).  According to Dr. Enge's treatment notes, Plaintiff did not improve in September 2003, and did not show up for any of her appointments in October 2003.  (AR 699-702).  On November 13, 2003, Dr. Enge again noted that Plaintiff's compliance was only "ok," and Plaintiff reported experiencing tactile hallucinations.  Plaintiff did not show up for her next two appointments, and when she showed up again in January, 2004 she reported being off her medication for "a while" and that voices were screaming at her to hurt herself and her roommate.  (AR 696).

As is apparent from Dr. Enge's treatment notes, Plaintiff did better when she was compliant with her medications.  It was when Plaintiff missed appointments and did not take her medications that she reported experiencing hallucinations.  In fact, Dr. Enge specifically

24

noted in her client recovery plan that Plaintiff "will maintain current stability with psychotropic medications and case management." (AR 700); See 20 C.F.R. § 416.930(a) ("In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work."); 20 C.F.R. § 416.930(c) ("We will consider your physical, mental, educational, and linguistic limitations . . . when determining if you have an acceptable reason for failure to follow prescribed treatment.").

Moreover, the testimony of a medical expert may serve as substantial evidence, so long as it is supported by the record evidence. Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995); see also Morgan v. Comm'r of the Soc. Sec. Admin., 169 F.3d 595, 602 (9th Cir. 1999); Magallanes, 881 F.2d at 752 (explaining that the ALJ did not rely on the medical expert's testimony by itself to reject the treating physician's opinion). Dr. Rath, a medical expert, testified at Plaintiff's hearing that if Plaintiff takes her medication she functions with moderate limitations, however, "[w]hen she doesn't take her medication, the ratings sort of kick up to marked and are consistent with [Dr. Enge's] ratings." (AR 720). He further noted that any discrepancies in the record, including Dr. Enge's work capacity evaluation, are likely the result of Plaintiff being only "partially medicated," because Plaintiff often did not return for treatment until after she had run out of medication. (AR 720). Dr. Rath testified that while medicated, Plaintiff is capable of carrying out simple, but not complex, instructions, and can interact with co-workers and supervisors, with up to a moderately stressful contact, but can have no contact with the general public or work in a hazardous situation. (AR 724). He also

stated that Plaintiff, while medicated, is able to maintain attendance sufficient for regular employment. (AR 724). Dr. Rath's testimony is supported by the record.

Dr. Gill, Plaintiff's treating psychiatrist at Phoenix Outpatient Services from at least March 2001 through March 2003,[14] noted in several treatment records that Plaintiff "decompensates" without her medications. (See e.g., AR 348, 351, 353-54, 361-2, 364, 371-72, 375-76, 379, 381, 440, 444, 447, 652, 656, 659, 661). Moreover, the records indicate that Plaintiff would often feel a "little better" during a period where Dr. Gill noted her compliance was "fair" or "good." (See e.g., AR 436, 439, 442). Conversely, it was during periods that Plaintiff reported being out of medication that she also told Dr. Gill she was hearing voices. (AR 632).

In addition, on April 26, 2001 Dr. Gregg, a consulting doctor, conducted a mental RFC assessment of Plaintiff. (AR 321-28). On December 31, 2002, Dr. Becraft, also a consulting doctor, did the same. (AR 606-22). Both doctors independently found Plaintiff mentally was not significantly limited in most areas, and only mildly or moderately limited with regard to a few tasks.[15]   See Andrews, 53 F.3d at 1041

---

[14]  Dr. Gill appears to have been Plaintiff's treating psychiatrist prior to March 2001 as well, however, the record does not contain treatment notes from before March 2001.

[15]  Specifically, Dr. Gregg concluded that Plaintiff was not significantly limited, except that she was moderately limited in her ability to understand, remember, and carry out detailed instructions. (AR 321-22). He found she was only mildly limited in the activities of daily living and in her ability to maintain social functioning, and was moderately limited in her ability to maintain concentration,

(holding that "[r]eports of consultative physicians called in by the [Commissioner] may serve as substantial evidence.").

Finally, an ALJ may satisfy his burden of providing specific and legitimate reasons "'by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (quoting Cotton v. Bowen, 799 F.2d 1403, 1408 (9th Cir. 1986)); see also Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) (citing Magallanes).  Here, the ALJ offered an accurate and detailed summary of Plaintiff's medical history, including the observations and diagnoses of the doctors who treated Plaintiff for her physical and mental impairments during the relevant time period.  (See AR 488-89).

Plaintiff argues, however, that the ALJ's conclusion that Plaintiff decompensated when she was noncompliant with her medication was error, because (1) Dr. Enge's records indicate that Plaintiff was not improving

---

persistence, or pace.  (AR 326).  Dr. Becraft concluded that Plaintiff was not significantly limited in her ability to understand and remember, with the sole exception that she was moderately limited in her ability to understand and remember detailed instructions.  (AR 620).  She found Plaintiff was not significantly limited in her ability to sustain concentration and persistence, except that she was moderately limited in her ability to carry out detailed instructions and ranged from not significantly limited to moderately limited in her ability to complete a normal workday and workweek without interruptions.  (AR 620).  Also, she determined that Plaintiff was not significantly limited in her ability to socially interact, except that she ranged from not significantly limited to moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors and her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (AR 621).  Finally, Dr. Becraft found that Plaintiff was not significantly limited in her ability to adapt.  (AR 621).

after August 2003, (2) Plaintiff's medications were not working properly, and (3) Plaintiff's mental illness was a significant factor in her not seeking consistent medical treatment. (Jt. Stip. at 5-6). These arguments are unfounded.

First, while it is true that Dr. Enge's records indicate that Plaintiff was not improving after August 2003, they also indicate that Plaintiff missed several appointments and did not take her medication for a significant portion of that time. (AR 696). Plaintiff cancelled her only appointment for October 2003, and did not show up for either of her two scheduled appointments in December 2003. Moreover, at her January 2004 appointment, Plaintiff reported being out of medication for "a while." See 20 C.F.R. § 416.930(a) ("In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work."); 20 C.F.R. § 416.930(c) ("We will consider your physical, mental, educational, and linguistic limitations . . . when determining if you have an acceptable reason for failure to follow prescribed treatment."). Notably, in his decision, ALJ Harrell weighs Plaintiff's complaints of tactile hallucinations, panic attacks, agitation, loss of appetite, and poor sleep during this time, as well as her missed appointments and her January 2004 admission that she had run out of medication. (AR 489). Accordingly, because it appears from Dr. Enge's treatment notes that Plaintiff's decompensation subsequent to August 2003 was attributable at least in part to Plaintiff's noncompliance, and because the ALJ addressed this in his opinion, Plaintiff's argument regarding her "lack of improvement" after August 2003 is without merit.

\\

Second, Plaintiff argues that her decompensation was not attributable to her noncompliance because her medication was not working properly. She cites Dr. Enge's treatment notes for November 13, 2003 which states "Apparently Abilify not helpful either." (Jt. Stip. at 5). However, such a statement, that a medication is not helpful, does not indicate that there are <u>no</u> helpful medications. Moreover, the numerous indications that Plaintiff decompensates without her medication contradicts the notion that her medication was not working properly. (<u>See e.g.</u>, AR 348, 351, 353-54, 361-2, 364, 371-72, 375-76, 379, 381, 440, 444, 447, 652, 656, 659, 661). Accordingly, this argument is not persuasive.

Third, Plaintiff argues that her decompensation was not attributable to her noncompliance because her mental illness was a significant factor in her not seeking consistent medical treatment. (Jt. Stip. at 6). However, Plaintiff's argument is again unconvincing. Drs. Gill and Rath specifically found that Plaintiff decompensates when she is noncompliant with her medication, and Dr. Enge's treatment notes are consistent with this. Moreover, during this time period, she was capable of doing some chores and going to the movies. These activities suggest that her mental illness was not so incapacitating that she was unable to seek treatment. Accordingly, there is substantial evidence supporting the ALJ's conclusion that such noncompliance is caused by Plaintiff's failure to follow her treatment, rather than her mental illness in and of itself.

Finally, Plaintiff argues that the ALJ's failure to address Dr. Enge's notation in her January 15, 2004 report that Plaintiff "Needs

SSI" constitutes error.   However, an ALJ need not discuss all of the evidence presented in interpreting the evidence and developing the record.   <u>Howard ex rel. Wolff v. Barnhart</u>, 341 F.3d 1006, 1012 (9th Cir. 2003) (citing <u>Vincent v. Heckler</u>, 739 F.2d 1393, 1394-95 (9th Cir. 1984)).   As reflected above, the ALJ cited and discussed the probative evidence for the relevant time period in his decision with respect to Plaintiff's mental health.   <u>Id.</u> at 1012 (ALJ not required to discuss evidence that is "neither significant nor probative.").   Moreover, Dr. Enge's summary conclusion that Plaintiff "Needs SSI" is not controlling or probative because it is an ultimate administrative finding reserved for the Commissioner.   <u>See</u> 20 C.F.R. § 416.927(e) (opinions that would direct the determination of disability are not medical opinions but rather are opinions on issues reserved to the Commissioner). Consequently, Plaintiff's argument that the ALJ erred by not considering Dr. Enge's opinion that Plaintiff "Needs SSI" is not persuasive.

Accordingly, the ALJ did not err in rejecting Dr. Enge's opinions. Plaintiff's arguments are without merit, and the ALJ provided specific and legitimate reasons for weighing the medical opinions as he did, and the overwhelming concurrence between the other treating psychiatrist's treatment notes, the medical expert's testimony, and the consultative evaluations serve as substantial evidence for his conclusion.

**B.**   **The ALJ Appropriately Considered the Clinical Assessment Completed by Elaine Holzer, M.F.C.C.**

Plaintiff also argues that the ALJ erred by failing to address the opinion of Elaine Holzer, a Marriage, Family, and Child Counselor.   (Jt.

30

Stip. at 11).  Specifically, Plaintiff asserts that the ALJ did not consider Ms. Holzer's opinion that "Plaintiff has both short and long term memory problems that would likely have significant ramifications for the work environment."  (Jt. Stip. at 11).  As well as that "Plaintiff has 'frequent tearfulness, decreased sleep, hopelessness, helplessness, anhedonia, decreased appetite, increased irritability, vague fleeting SI.'"  (Jt. Stip. at 11).  This argument fails, however, because an ALJ is not required to expressly address every item of evidence in his written decision.

As indicated above, an ALJ need not expressly discuss all of the evidence presented.  Howard ex rel. Wolff, 341 F.3d at 1012.  First, it should be noted that this form is insignificant in light of the entire record.  The diagnosis form to which Plaintiff refers is a four-page initial evaluation from a social worker that Plaintiff appears to have only seen on one occasion.  The value of this document is minimal in comparison to extensive records provided by Plaintiff's treating psychiatrists, Drs. Gill and Enge.[16]  See Magallanes, 881 F.2d at 751 (generally speaking, the court must attribute greater weight to the opinions of treating physicians because they are hired to treat the patient and consequently have more interaction with the individual).

Second, as reflected above, the ALJ did cite and discuss the probative evidence for the relevant time period in his decision.  Ms.

---

[16]  In fact, Plaintiff admits that Ms. Holzer "is not a physician or other 'acceptable' medical source, . . . and the ALJ may thus, accord her opinion less weight than opinions from an acceptable medical source."  (Jt. Stip. at 11).

Holzer's evaluation, in contrast, is not particularly probative evidence. While Plaintiff asserts that Ms. Holzer "opined that the Plaintiff has both short and long term memory problems that would likely have significant ramifications for the work environment," this claim is exaggerated. The diagnosis form to which Plaintiff refers is a standard form requiring Ms. Holzer to fill in various blanks and check boxes. (AR 667-671). Ms. Holzer checked the boxes under mental status for "[r]ecent memory problem" and "[r]emote memory problem." (AR 669). She then elaborated by noting "problems with past dates & current appointments." (AR 669). Ms. Holzer gave no opinion as to the significance of these problems nor to the impact that they could have on Plaintiff's work environment. Moreover, even if Ms. Holzer did come to such conclusions, her opinion would not be controlling or probative because it is an ultimate administrative finding reserved for the Commissioner. See 20 C.F.R. § 416.927(e) (opinions that would direct the determination of disability are not medical opinions but rather are opinions on issues reserved to the Commissioner).

     The references to Plaintiff's other symptoms are also not probative. Plaintiff cites Ms. Holzer's notes where she is asked to "describe [Plaintiff's] current depression problem." Ms. Holzer wrote: "frequent tearfulness, decreased sleep, hopelessness, helplessness, anhedonia, decreased appetite, increased irritability, vague fleeting SI." (AR 669). This description is taken nearly word for word from the first page of the form where Ms. Holzer filled in the blank for the presenting problem: "Cl reports depressed mood, frequent tearfulness, decreased sleep, hopelessness, helplessness, anhedonia, decreased appetite, increased irritability and thoughts of 'not wanting to be

here' though she denies suicidal intent." (AR 667). Accordingly, what Plaintiff cites as Ms. Holzer's opinion is really Plaintiff's own description as given in her initial evaluation. As the ALJ thoroughly discussed Plaintiff's history of depression in his decision, including similar descriptions of her depression as given by Plaintiff, this statement is not in itself probative.[17] (See AR 488-89); See Howard ex rel. Wolff, 341 F.3d at 1012 (ALJ not required to discuss evidence that is neither significant nor probative). Consequently, Plaintiff's argument that the ALJ erred by not considering Ms. Holzer's evaluation is without merit.

Moreover, even though the ALJ did not specifically reject Ms. Holzer's findings in his decision, this oversight would be, at worst, harmless error given the fact that the form is of little significance in light of the record as a whole and that the ALJ addressed similar reports by Plaintiff and her treating psychiatrists. See Curry v. Sullivan, 925 F.2d 1127, 1129 (9th Cir. 1990) (harmless error rule applies to review of administrative decisions regarding disability). Accordingly, as the ALJ's failure to consider Ms. Holzer's clinical evaluation does not constitute legal error, there are no grounds for remand.

\\

\\

\\

---

[17] For a brief example, in his decision the ALJ notes Plaintiff's reports of "decreased energy, motivation, and sleep," her "increased anxiety and crying spells," and that she "had panic attacks, felt agitated, had loss of appetite, and her sleep was poor." (AR 488-89).

1

**CONCLUSION**

2

3        Consistent with the foregoing, IT IS ORDERED that Judgment be

4   entered AFFIRMING the decision of the Commissioner and dismissing this

5   action with prejudice.   IT IS FURTHER ORDERED that the Clerk of the

6   Court serve copies of this Order and the Judgment herein on counsel for

7   both parties.

8

9   DATED: April 12, 2006.

10

11                                    _____/s/_____
                                      SUZANNE H. SEGAL
12                                    UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28